[Cite as *Yangtze RR Fasteners Internatl. USA, Inc. v. Ohio Valley Trackwork, Inc.*, 2026-Ohio-1518.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
GALLIA COUNTY

| | | |
|---|---|---|
| Yangtze Railroad Fasteners International USA Inc., | : | Case No. 25CA3 |
| | : | |
| Plaintiff-Appellant, | : | |
| | : | |
| v. | : | <u>DECISION AND</u> |
| | : | <u>JUDGMENT ENTRY</u> |
| Ohio Valley Trackwork Inc., | : | |
| | : | |
| Defendant-Appellee. | : | **RELEASED 4/21/2026** |

_____

<u>APPEARANCES</u>:

Robert R. Rittenhouse, Lavelle and Rittenhouse, LLC, Athens, Ohio, for appellant.

Michael L. Barr, Barr Law Office, LLC, Pomeroy, Ohio, for appellee.[1]

_____

Hess, J.

**{¶1}** Yangtze Railroad Fasteners International USA Inc. ("Yangtze") appeals a judgment of the Gallia County Court of Common Pleas ruling in favor of Ohio Valley Trackwork Inc. ("OVT") on Yangtze's breach of contract and unjust enrichment claims. Yangtze presents one assignment of error asserting the trial court erred in granting OVT judgment on the breach of contract claim as this was against the manifest weight of the evidence presented at trial. For the reasons which follow, we sustain the assignment of error, reverse the trial court's judgment as to the breach of contract claim, and remand for further proceedings consistent with this decision. Yangtze does not challenge the judgment as to the unjust enrichment claim, so we affirm that part of the judgment.

I.  FACTS AND PROCEDURAL HISTORY

---

[1] The appellee did not file an appellate brief.

{¶2} In November 2022, Yangtze, DBA Yangtze Railroad Materials, filed a complaint against OVT for breach of contract and unjust enrichment. The matter proceeded to a bench trial at which evidence was presented that Yangtze is a Maryland corporation which is registered as a foreign corporation in Ohio and that Patrick Young is its owner and CEO.[2] Young testified that he speaks Mandarin, English is "not really" his primary language, and he has hearing and vision problems. Young testified Yangtze supplies railroad materials, has been in business 35 or 36 years, and has done business with OVT for maybe over 20 years.

{¶3} The trial court admitted into evidence a purchase order dated April 20, 2021, for goods totaling $54,095.40 ("P.O. #7389"). P.O. #7389 identifies the vendor as "Yangtze Railroad Fasteners" at 500 N. North Point Road in Rosedale, MD, and indicates the goods are to be shipped to OVT. P.O. #7389 indicates delivery was to be August or September 2021, and the "[t]erms" were "NET 30," which "'is a standard term which means that payment is due within thirty days from the date of invoice.'" *Hilo Prods., Inc. v. Target Corp.*, 709 F.Supp.3d 721, 728 (D.Minn), quoting *C & M Giant Tire, LLC v. Triple S Tire Co.*, 2014 WL 5824789, *3 (E.D.Ky. Nov. 10, 2014). Young testified P.O. #7389 was from OVT and that the goods were delivered.

{¶4} The order was evidently fulfilled in two parts, one part involving $12,440.70 in goods, which is not at issue, and one part involving $41,654.70 in goods, which is at issue. The court admitted an invoice for P.O. #7389 dated September 7, 2021, which

---

[2] This information appears in Yangtze's responses to interrogatories which were answered by an office assistant at Yangtze with the assistance of Young and his personal assistant. When Young was asked about Yangtze's corporate status at trial, he gave confusing answers. When asked if Yangtze was a corporation, he testified, "No, we are corporate," and then "Not incorporate." Counsel then stated, "You're a corporate, okay. You're not a dba for Patrick, it's a separate…" and Young said, "No." Counsel then said "corporation," and Young said, "No."

states "Yangtze Railroad Materials" and the Maryland address on the top, indicates OVT is being billed for $41,654.70 in goods, and indicates the due date is October 7, 2021. The court admitted a copy of a check dated March 1, 2022, from OVT to "Yangtze Railroad Fasteners" for $1,654.70. The court admitted a second invoice for P.O. #7389 which is identical to the first one except it applies the $1,654.70 payment, making the balance due $40,000.  The court also admitted a bill of lading dated September 7, 2021, which references P.O. #7389 and "Yangtze Railroad Materials Inc." at the Maryland address. Young testified that this document acted as a receipt that OVT received the goods.   Young testified OVT still owed "over" $40,000, and the balance due was "approximately $40,000."

## A.  Emails

{¶5}    The court admitted paper copies of emails purportedly exchanged between Young and Juanita Kaye Miller, OVT's office administrator. The messages do not appear to have been sent within a single email chain in which each response is followed by all the messages which preceded it; most of the messages appear to be part of email chains containing only a few messages.  The emails purportedly by Young all appear to be from his email address, but Young denied sending some of them.  We summarized the emails below in what we believe to be chronological order.  Some emails from Miller to Young do not include date and time information, so we determined the order in which they were sent based on where they appear in the email chains, their contents, and Miller's testimony about them.

{¶6}    The emails indicate that on December 13, 2021, Miller asked Young for a quote, and in response, Young asked Miller to take care of overdue invoices. It appears

Young attached several invoices to his email, including one for P.O. #7389, but the

attachments were not introduced into evidence.  A few minutes later, Young sent another

email[3] stating:

> Please we need to receive the overdue invoice through wire transfer to our alternative available bank wire instruction, As our previous account is not available till next year [sic].
>
> Kindly please check and advise us when you can send the payment, in further to send wire instruction details [sic].

**{¶7}** On December 21, 2021.  Miller stated, "Just wanted to let you know that I

did mail check # 26465 out for $44,806.70."  Young responded:

> We do not receive payment through check for now, as we are having issue with our check payment method [sic].  We kindly ask you to cancel the check and make the payment through ACH or wire transfer payment to our corresponding bank details.

**{¶8}** On December 22, 2021, Miller stated:

> I am in the process of getting my password reset as I do not utilize the ACH system.  It has been a few years since I have been in the online portal for the accounting part.  As soon as I have received my reset information and am able to get it processed I will let you know.

Young said, "I we wait to hear from you soon thanks [sic][.]"  It appears Miller then stated,

"Could you please give me the information for me to send the payment to your bank?" In

an email Young denies sending, he appears to respond:

> Please kindly find below our bank details to receive the total payment. Should you have any questions or concerns, please do not hesitate to contact me.
> Awaiting payment receipt for our bank reference.
>
> . . .
>
> BANK NAME: Citizens Bank of Las Cruces
> BENEFICIARY NAME: LUCILLE A TIERNEY DBA YANGTZE RAILROAD MATERIALS

---

[3] Young initially denied sending this email but then acknowledged he sent it.

Routing NO: . . .
ACCOUNT NO: . . .
Address 505 S Main St Las Cruces, NM 88004

**{¶9}**    Sometime before Christmas weekend, Miller wrote:

Thank you.  I hope to have info later today.  If I do hear back from him I will let you know[.]  We are leaving now for Christmas weekend and will be back on Monday[.]  Have a great time and Merry Christmas to you and yours. Sent from my iPhone[.]

**{¶10}**  On December 27, 2021, in an email Young denies sending, he appears to respond[4]:

Please as you have stated in your previous message last week to proceed with the wire transfer to our below wire instruction details today [sic].

We kindly ask to receive the bank payment receipt today for the unpaid invoice.

This email includes the same bank account information sent on December 22, 2021.  It appears the same day, Miller responded:

It has been sent to our wire department.  I am supposed to receive a phone call when they actually have it completed.

I will let you know as soon as I receive notification.

In an email Young denies sending, he appears to respond:  "Awaiting payment receipt, as soon as you receive the notification."[5]

---

[4] When the trial court put the emails in what it believed to be chronological order, it put this December 27, 2021 email before the email in which Miller mentions leaving for Christmas weekend.  However, Christmas weekend would have been before December 27, 2021, and the fact that this December 27, 2021 email appears at the top of a two email chain containing this email and the Christmas weekend email suggests that this December 27, 2021 email was a response to the Christmas weekend email.  In addition, Miller testified that this December 27, 2021 email was a reply to the Christmas weekend email.

[5] When the trial court put the emails in what it believed to be chronological order, it put this email before Miller's email about sending information to the wire department. However, the fact that this email appears at the top of a two email chain containing this email and the wire department email suggests this email was a response to the wire department email.

**{¶11}** On December 28, 2021, in an email Young denies sending, he appears to tell Miller: "Please we kindly advise you to request for the wire transfer copy from your bank, as we have check with our bank today and we have not yet receive the payment sent yesterday [sic]." It appears Miller then responded with an email stating, "Receipt is attached," but no attachment was introduced into evidence. Then, in an email Young denies sending, he appears to thank Miller.

**{¶12}** There is no further correspondence until January 13, 2022, when Young emails Miller stating, "I am just sending you 6 of the **OVERDUE invoices one is last Sept of 2021 2 of the last Oct-2021**, could you please take car these matters for me [sic]." Miller responded:

> I have a question. In late December I received instructions that came from you for Wiring the monies. We sent the money and it has left our bank. The amount was $44,806.70. Did you not receive? I even have the confirmation page.

Young stated:

> We never receive the check for the amount was $44,806.70.
>
> Why don't you guys use ACH payment? I send you our ACH payment information attached.

 No attachment was introduced into evidence. Miller then said:

> I am going to have to see how to get the money back if it did not go to you. Making me think it was a scam. Have you had any trouble with being hacked maybe? The emails I was receiving from you gave me dollar amounts and everything. Have you ever heard of a Lucille Tierney or a Steven Maderson?

**{¶13}** The next correspondence occurs on January 25, 2022, when Miller asked Young for a quote. Young told Miller that he could not give her one until full payment was received. Miller responded, "I can send the other payment to you - $4621.25. I am still

trying to figure out how to go about getting the other back[.]"  Young responded: "OVT has overdue total of 67,456.15, especially one is over due start from last Aug-2021 [sic]."  Miller responded:

> Yes…..the large one is the one that I told you about that we thought was you and we submitted a wire for – I am contacting my bank to see what I can do to try to get our money back.  Therefore, we thought that we had paid you.  I can send you the copy of the transfer that we done thinking it was to you if that would help.  I am being honest with you.

The last email is from Miller to Young on January 26, 2022, and Miller asked, "Can I please mail the check for now?  As I am dealing with the bank and supposed fraud I would rather do paper checks until it is resolved please?"

**{¶14}** Young did not deny sending Miller any emails which included a signature block which contained his name, "Yangtze Railroad Materials," and additional information, such as Yangtze's Maryland address, phone and fax numbers, and a statement on confidential information.  As far as Young knew, his emails always include this signature block.  The signature block in the emails Young denied sending included only his name followed by "Yangtze Railroad Materials."  The record includes one email Young sent two people at Yangtze in which he forwarded Miller's email about mailing the $44,806.70 check; this email does not include any signature block for Young.

**{¶15}** In email chains which include the emails Young did not deny sending, messages from Miller to Young include what we will refer to as a "header" setting forth information regarding the sender, recipient, date and time sent, and subject. In email chains which include the emails Young denied sending, messages from Miller to Young do not include a header.

{¶16} In some of the emails Young denied sending, Miller's personal email address, or part of it, was cc'd. Young testified he did not recognize the addresses.

### B. Additional Testimony of Young

{¶17} Young testified that OVT usually paid Yangtze by check and never paid on time. Young was asked what he was trying to accomplish when he sent the December 21, 2021 email requesting payment by ACH or wire transfer. Young testified, "I'm a talk about a since they, they always late of payments or something [sic]. Okay, also in that time this is also has a problem with a Post Office delivers [sic]." He further testified, "Because the reason for that we have some checks that's missing, okay, which is the customer pays us [sic]. Okay, but usually when the other, other company even the check missed it, they replace it right away [sic]." Young testified Yangtze did not receive the check Miller told him she mailed.

{¶18} Young testified that the bank account information given to Miller was not for Yangtze's bank account. Yangtze only used Wells Fargo Bank.[6] Yangtze is in Maryland and has no business accounts in New Mexico. The names mentioned in one of Miller's January 13, 2022 emails, Lucille Tierney and Steven Maderson, meant nothing to him.[7]

{¶19} Young testified that he did not know who sent the emails he denied sending. Young admitted that he is not the only person with access to his email. His assistant has access to it, and at the time in question, he maybe had two assistants. Later, when asked how many people had access to his email at the time in question, he testified, "I can't tell."

---

[6] Yangtze's interrogatory responses also indicate that Yangtze has only held bank accounts at Wells Fargo Bank since January 1, 2020.

[7] Yangtze's counsel purported to read this email before asking if the names in it meant anything to Young, but in the transcript, the individuals are referred to as "Lucia Tinera" and "Steve Maderson" instead of as they are referred to in the email. However, it appears Young understood that counsel was asking about the individuals as named in the email.

Young indicated he did not think anyone in his office sent the disputed emails; if they had, the emails would have included his signature block. The only employee theft he had knowledge of was theft of products in 2018. When asked what steps he took to secure his email address, he testified, "We have a, that work people to take care [sic]. Also they use some security uh, by a Microsoft." He thought his email was password protected. Young testified that he investigated this matter by checking with IT people, and he indicated they did not think Yangtze was at fault. Young testified that aside from OVT, none of Yangtze's customers have reported getting a suspicious email from Yangtze. He indicated he believed OVT was lying about what happened to avoid paying Yangtze.

**{¶20}** Young testified that he is aware that hackers can "make it look like an email is from someone that's not from you." Yangtze introduced two articles, which the court admitted, which discuss the use of visually similar characters to deceive people in online schemes. One article notes to the human eye, Cyrillic glyphs can be confused with their Latin counterparts, but computers read them differently.

### C. Testimony of Miller

**{¶21}** Miller testified that as of 2021, she worked for OVT for about 17 to 18 years, and OVT had a business relationship with Yangtze that entire time. Prior to the incident at issue, OVT always paid by check. She could not recall if the $44,806.70 check was endorsed and cashed or cancelled but testified that it was replaced by the wire transfer. She did not have authority to initiate wire transfers; it was her job to gather and submit information regarding wire transfers to her boss. She did not call Young or anyone else at Yangtze to verify the wire instructions. The email address for Young was the one she always used to communicate with him, and nothing in the disputed emails led her to

believe she was not communicating with him. She did not find it odd for part of her personal email address to be cc'd. She has emailed Young from her phone, and she has her work and personal email on her phone, which is password protected. When asked if she recalled Young ever sending an email to her personal email before this, she testified, "Unless he was responding." Miller indicated her habit was to have one email chain per order. She thought the first email with the instructions appeared to "be part of the chain" even though it included only one other email.

**{¶22}** Miller acknowledged that in all the time she had dealt with Yangtze Railroad Materials, she never dealt with anyone named Lucille A. Tierney.[8] When asked if she would agree that Lucille A. Tierney was "not Yangtze Railroad," she testified, "I have no clue."[9] She was not aware that Yangtze was a corporation. She acknowledged Yangtze was "out of Maryland" and that in all the time she dealt with Young, she did not recall sending anything to New Mexico for payment. Miller acknowledged that on the transaction detail for the wire transfer, the beneficiary is identified as "LUCILLE A TIERNEY DBA YANGTZE RAILR OAD MATERIALS," with a space between the second "R" and "O" in railroad. When asked if she had any evidence Yangtze received the wire, she testified, "I just have their word." Counsel then said, "And their word is that they didn't receive it?" Miller said, "That's all, yes." Miller did not know why she asked Young about someone named Steven Maderson. Miller testified that in the time she worked for OVT she has

---

[8] The transcript indicates Miller was asked if she had dealt with "Lucia A. Tinera" and later asked if she dealt with "Lucille A. Tinera." However, it appears Miller understood that counsel was asking about Lucille A. Tierney, the named account beneficiary.

[9] Again, the transcript refers to "Lucille A. Tinera," but again, it appears Miller understand counsel was asking about Lucille A. Tierney.

never been involved in a situation like this one, and OVT's IT department investigated and did not find anything.

### D. Testimony of Little

{¶23}  Adam Little, one of OVT's owners since 2004, initiated the wire transfer.  He testified OVT placed an order relevant to that transfer, received the materials, and had not paid the entire invoice before he initiated the transfer. In all the time he dealt with Yangtze, its office was in Mayland, and it had never asked for a wire transfer before. To his knowledge, no one from OVT contacted Young to verify the authenticity of the wire instructions.  The disputed emails looked legitimate to him because they were "from the exact email address that we always received and sent emails." He did not think OVT owed Yangtze any money because OVT "wired the money to the account that we were told to wire the money to."  He had no reason to believe Yangtze did not control the account and testified, "Many company's [sic] have banks all over the country and all over the world."

{¶24}  When Little learned Young was claiming he did not receive the money, he checked with OVT's bank to make sure the money went to a valid account, which it did. He checked with OVT's email provider, which said nothing had been compromised on their side. He also completed a "Complaint Referral Form" on the Internet Crime Complaint Center, an FBI crime site. In the form, he checked a box to indicate that spoofed email was used in the incident.  His understanding was that a spoofed email is one "disguised as being from someone but really from someone else." He picked this option because it was the "closest one."  He did not hear back from the FBI.  Little testified that during the time he has been at OVT there have been no employee theft incidents or other email spoofing incidents.  When asked what steps OVT took to secure its email, he

testified each person has their own computer which is protected by a personal password and that "they're always locked. We usually, if we get up away from our computers we control/alt/delete lock."

### E. Judgment

**{¶25}** The trial court issued a judgment entry stating there was no dispute that Yangtze "supplied OVT with product for which it requested payment," and "[t]he difficulty lies in the payment or attempted payment and fraudulent emails and payment link information." The court stated that "[e]ach party asserts that the other is responsible for a 'hack' which caused OVT to submit payment to a fraudulent source." The court noted that there was "no expert witness evidence . . . regarding how the 'hack' took place and which party's email was susceptible and attacked." The court also noted that it had found "very little statutory or case law on this subject," that the parties "cited a few cases," and that the court "found a few others, none of which are exactly on point regarding the legal issues in this case." However, the court stated that "[a] review of the case law appears to place accountability for the loss on the party who was in the best position to discover the fraudulent prompt for payment."

**{¶26}** After summarizing the evidence, the court reached the following conclusions. Both parties claimed their IT departments found no inconsistencies or hacks, and neither party presented expert testimony as to how the hack occurred. However, despite "discrepancies in the header and signature lines between the emails Plaintiff says he sent and the ones which appear to be fraudulent, each and every email came from the exact address which Plaintiff testified is his," and "Plaintiff admitted that others in his office had access to his email account." The court found that "Defendant

established that only one person in its office had access to the account under which the email communications had taken place." The court found "Plaintiff failed to prove that the Defendant did not submit payment. Defendant originally sent a check for the outstanding amount and Plaintiff rejected Defendant's check. Plaintiff told Defendant to cancel the check and pay by electronic means. Plaintiff told Defendant that they would send a link for payment." The court found that "[t]he link that was provided came from the Plaintiff's email address shortly after Plaintiff agreed to send it." Therefore, the court found in favor of OVT and against Yangtze.

## II. ASSIGNMENT OF ERROR

**{¶27}** Yangtze presents one assignment of error:

The trial court erred in granting judgment in favor of the appellant [sic], on appellant's breach of contract claim, as this was against the manifest weight of the evidence presented at trial.

## III. LAW AND ANALYSIS

**{¶28}** In its sole assignment of error, Yangtze contends the trial court erred in granting judgment in favor of OVT on Yangtze's breach of contract claim as this was against the manifest weight of the evidence. Yangtze maintains that it proved the elements of this claim by a preponderance of the evidence. Yangtze claims there is no dispute OVT ordered railroad materials from Yangtze, which it delivered, and that it never received payment. Yangtze asserts the trial court mistakenly focused on whether OVT submitted payment instead of on who it submitted payment to and whether Yangtze received it. Yangtze claims there is no evidence it received payment. OVT paid Lucille A. Tierney DBA Yangtze Railroad Materials, whom neither party knows.

**{¶29}** Yangtze maintains OVT's defense regarding email spoofing is meritless. Yangtze asserts that "[r]egardless of how wiring instructions are received, in our modern world, it is nothing short of negligent for a party to transmit a wire payment without first verifying the validity of such wiring instructions." Yangtze claims the negligence in failing to verify the instructions in this case is "completely fatal" to OVT's defense. Yangtze also asserts that there were "so many bright red flags associated with" the "spoof emails" Miller received "that a reasonable person should have known that [they] were not legitimate" and that the trial court "brushed off the red flags." In addition, Yangtze claims that there is no expert evidence showing the disputed emails were in fact from Young's email account, that it is completely speculative that more than one person having access to the account resulted in the email spoofing, and that the spoofing is more likely the result of Miller resetting her ACH password just hours before the email spoofing started.

### A. Standard of Review

**{¶30}** In evaluating whether a judgment is against the weight of the evidence, an appellate court

> weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed.

> Moreover, when reviewing the evidence under this standard, we are aware that the weight and credibility of the evidence are to be determined by the trier of fact; we thus defer to the trier of fact on these issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. The trier of fact is free [to] believe all, part, or none of any witness's testimony.

> Ultimately, a reviewing court should find a trial court's decision is against the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the decision.

(Citations omitted.) *Wootten v. Culp*, 2017-Ohio-665, ¶ 19-21 (4th Dist.).

**{¶31}** App.R. 12(C)(1) states:

In any civil action or proceeding that was tried to the trial court without the intervention of a jury, and when upon appeal a majority of the judges hearing the appeal find that the judgment or final order rendered by the trial court is against the manifest weight of the evidence and have not found any other prejudicial error of the trial court in any of the particulars assigned and argued in the appellant's brief, and have not found that the appellee is entitled to judgment or final order as a matter of law, the court of appeals shall reverse the judgment or final order of the trial court and either weigh the evidence in the record and render the judgment or final order that the trial court should have rendered on that evidence or remand the case to the trial court for further proceedings.

### B.  Elements of Breach of Contract Claim

**{¶32}** """"A contract is generally defined as a promise, or a set of promises, actionable upon breach.  Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration."""" *Adams v. Morningstar*, 2022-Ohio-918, ¶ 25 (4th Dist.), quoting *Williams v. Ormsby*, 2012-Ohio-690, ¶ 14, quoting *Kostelnik v. Helper*, 2002-Ohio-2985, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976).

**{¶33}** "'A breach of contract is a failure without legal excuse to perform any promise which forms a whole or part of a contract, including the refusal of a party to recognize the existence of the contract or the doing of something inconsistent with its existence.'" *United Assn. Local 168, Apprentice Educational Fund v. Robinson*, 2025-Ohio-2421, ¶ 33 (4th Dist.), quoting *Bradley v. Pentajay Homes, Div. of C & E Stores, Inc.*, 1991 WL 122853, *6 (4th Dist. July 3, 1991), citing *Natl. City Bank of Cleveland v. Erskine & Sons, Inc.*, 158 Ohio St. 450 (1953), paragraph one of the syllabus.  "'To prove

a breach of contract claim, a plaintiff generally must show the existence of a contract, performance by the plaintiff, a breach by the defendant, and damage or loss to the plaintiff.'" *Krista v. Thompson*, 2025-Ohio-5566, ¶ 38 (4th Dist.), citing *Alexander Local School Dist. Bd. of Edn. v. Village of Albany*, 2017-Ohio-8704, ¶ 28 (4th Dist.), citing *McCamon-Hunt Ins. Agency, Inc. v. Med. Mut. of Ohio*, 2003-Ohio-1221, ¶ 10 (7th Dist.). The plaintiff must establish these elements by a preponderance of the evidence. *SAI Hospitality, Inc. v. RCVV, Inc.*, 2025-Ohio-4596, ¶ 26 (7th Dist.).

### C. Legal Excuse

**{¶34}** The trial court suggested that one who wires money pursuant to fraudulent wire instructions is legally excused from performance under a contract if the other party to the contract was in the best position to discover the fraudulent prompt for payment. We are not aware of any Ohio statute or case law addressing this issue. At the trial level, OVT directed the court to one Ohio case, but as discussed below, it is inapposite. Thus, it appears the court's conclusion was derived from cases from other jurisdictions the parties directed it to, which we discuss below, and unidentified cases from other jurisdictions which the court found.

### 1. *Hoffman v. Atlas Title Solutions, Ltd.*

**{¶35}** In the Ohio case OVT cited below, *Hoffman v. Atlas Title Solutions, Ltd.*, 2023-Ohio-1706 (3d Dist.), a real estate buyer wired the purchase funds to a fraudster instead of Atlas Title Solutions, Ltd., whom the buyer and sellers engaged as an escrow and title agent, per email instructions which appeared to be from Atlas. *Hoffman* at ¶ 3-5, 7-8. The buyer sued Atlas for negligence, breach of fiduciary duty, and breach of contract. *Id.* at ¶ 13. The trial court granted Atlas summary judgment on the breach of

fiduciary duty and breach of contract claims and dismissed the negligence claims at the buyer's request. *Id.* at ¶ 25-26. The appellate court reversed, concluding the trial court erroneously found there was no privity of contract, a triable issue as to the existence of an implied contract for escrow services existed, and therefore, a triable issue as to the existence of a fiduciary duty remained and whether Atlas breached it. *Id.* at ¶ 1-2, 38, 43-44, 48. The court acknowledged "more percolating issues exist," the case presented "a novel issue requiring the analysis of who bears the responsibility for the escrow fraud that took place in this case," and triable issues remained as to whether Atlas implemented proper security measures to prevent the buyer's "personal information from being 'phished' to precipitate the 'spoofed' email or whether [the buyer] should have recognized that the email was 'spoofed.'" *Id.* at ¶ 2.

**{¶36}** We fail to see what relevance *Hoffman* has to the present dispute. *Hoffman* did not involve a breach of contract action between the buyer and seller and did not consider or hold that in such an action, accountability for loss resulting from payment being wired to a fraudster falls on the party who was best positioned to discover the fraudulent prompt for payment. Rather, *Hoffman* involved an action between the buyer and an alleged escrow agent which purportedly had a fiduciary duty to the buyer.

### 2. Cases from Other Jurisdictions

**{¶37}** The parties directed the trial court to several cases from other jurisdictions. In *Meritdiam, Inc. v. Facets Fine Jewelry, LLC*, 2015 WL12660377 (C.D.Cal. Apr. 27, 2015), a diamond buyer sent payment via wire transfer per email instructions the seller denied sending, and the seller sued the buyer for breach of contract. *Id.* at *1-2, 4. In denying the buyer's motion for summary judgment, the district court observed that neither

party presented it with authority on how California law governs the situation of a third-party fraud causing a contract payment to be misdirected, and the court failed to find guidance through its own research. *Id.* at *6. The court stated absent further direction from the parties, it believed liability would likely lie with the party the jury determined was "most greatly at fault in causing the payment to be misdirected." *Id.*

{¶38} In *Arrow Truck Sales, Inc. v. Top Quality Truck & Equip., Inc.*, 2015 WL 4936272 (M.D.Fla. Aug. 18, 2015) ("*Arrow*"), a truck buyer followed wire instructions emailed by a fraudster. *Id.* at *1, 3-4. The buyer sued the seller and its sales associate for among other things, breach of contract for failure to deliver the trucks, and negligence for failure to use reasonable security measures to protect their business transactions conducted over the sales associate's email account. *Id.* at *1, 5. Following a bench trial, the district court concluded the buyer breached by not paying the seller, so the seller had no obligation to deliver the trucks. *Id.* at *1, 5. Regarding the negligence claim, the court concluded neither of the individuals involved in the transaction negligently handled their email accounts. *Id.* at *5. The court then considered which party to a contract bears the loss stemming from fraud by an outsider that results in nonperformance of that contract. *Id.* The court found helpful cases in the banking context dealing with third-party imposters and forged checks. *Id.* Citing UCC 3-404(d), the court explained that under the imposter rule, "the party who was in the best position to prevent the forgery by exercising reasonable care suffers the loss," and the court concluded based on the facts before it that the buyer's assistant manager was in the best position to prevent the fraud, and the buyer should suffer the loss associated with the fraud. *Id.* at *3, 5-6.

{¶39} In *Bile v. RREMC, LLC*, 2016 WL 4487864 (E.D.Va. Aug. 24, 2016), the law firm representing the defendants wired settlement funds to a fraudster who compromised the email account of the plaintiff's attorney. *Id.* at *1. The parties filed cross-motions to enforce the settlement agreement. *Id.* The district court, guided by contract principles and "the persuasive authority of Article 3 of the U.C.C.," concluded the defendants substantially performed their obligations under the settlement agreement and were entitled to specific performance of the plaintiff's obligations under it. *Id.* at *5. The court found the plaintiff's attorney/agent failed to use ordinary care under the circumstances which substantially contributed to the loss. *Id.* at *11.

{¶40} In *Beau Townsend Ford Lincoln, Inc. v. Don Hinds Ford, Inc.,* 759 Fed.Appx. 348 (6th Cir. 2018), a hacker purportedly infiltrated the seller's email account and sent the buyer fraudulent wiring instructions, which the buyer followed, and the seller sued the buyer for, among other things, breach of contact. *Id.* at 349, 352. The district court granted the seller summary judgment, and the Sixth Circuit reversed. *Id.* at 349, 352. After considering the contract principle of mutual mistake, *Arrow*, *Bile*, and the doctrine of agency by estoppel, the Sixth Circuit concluded that "[t]o decide this case, the factfinder must determine which party 'was in the best position to prevent the fraud,'" which required a trial. *Id.* at 359, quoting *Arrow* at *6.

{¶41} In *J.F. Nut Co. v. San Saba Pecan*, *LP*, 2018 WL 7286493, *3, fn. 4 (W.D.Tex. July 23, 2018), the district court, in denying summary judgment on a breach of contract claim, found *Arrow and Meritdiam* persuasive, concluded liability for a misdirected wired payment would be determined based on an allocation of fault between the parties, but encouraged the parties to submit additional authority before trial.

**{¶42}** In *Jetcrete N. Am. LP v. Austin Truck & Equip., Ltd.*, 484 F.Supp.3d 915 (D.Nev. 2020), a truck buyer followed fraudulent wire instructions. *Id.* at 916-917. The buyer brought breach of contract and other claims against the seller. *Id.* at 918. Following a bench trial, the district court ruled in favor of the seller. *Id.* at 921. The court explained that even under an analysis based on Nevada's version of the UCC's imposter rule, the buyer should suffer the loss because even though the hack of the seller's email account created the scenario for loss, the buyer was in the best position to prevent the loss by taking the reasonable precaution of verifying the wiring instructions by phone. *Id.* at 918-920. The failure to do so was "especially disconcerting" after the buyer "received conflicting email instructions within minutes of each other." *Id.* at 920

**{¶43}** In *Parmer v. United Bank, Inc.*, 2020 WL 7232025 (W.Va. Dec. 7, 2020), another case involving a settlement agreement and fraudulent wire transfer instructions, the lower court applied the imposter rule and concluded the plaintiff must bear the loss and remit the settlement funds to the defendant, United Bank, Inc. *Id.* at *3, 6. On appeal, the Supreme Court of Appeals of West Virgina rejected the suggestion that the defendant was in the best position to prevent the fraud because the loss could have been averted if the plaintiff or her counsel exercised reasonable care and verified the wire instructions. *Id.* at *6. The instructions were "plainly suspect" as they directed payment to Chase Bank in Texas for the benefit of an entity uninvolved in the parties' dealings and unknown to the defendant. *Id.* The parties' dealings dated back to 2014 and involved one prior wire transfer directly to United in West Virginia, not an uninvolved, outside entity. *Id.*

### 3. Trial Court's Rule

**{¶44}** It is not a foregone conclusion that we should, as the trial court evidently did, adopt a rule placing accountability for loss in a case such as this on the party in the best position to discover the fraudulent prompt for payment based on the above cases. However, it is unnecessary for us to evaluate the correctness of that rule today because Yangtze does not challenge it on appeal. Yangtze's assignment of error focuses on the weight of the evidence, not the validity of the rule the trial court adopted.

### D. Analysis

**{¶45}** The trial court's judgment on the breach of contract claim was against the manifest weight of the evidence. Yangtze presented uncontradicted evidence of the existence of a contract. The trial court admitted into evidence P.O. #7389 from OVT to Yangtze (identified as "Yangtze Railroad Fasteners") for the purchase of $54,095.40 in goods. "Generally, the submission of a purchase order is viewed as being an offer, which may then be accepted or rejected by the offeree." *Spoerke v. Abruzzo*, 2014-Ohio-1362, ¶ 30 (11th Dist.), citing *Am. Bronze Corp. v. Streamway Prods.,* 8 Ohio App.3d 223 (8th Dist.1982), paragraph one of the syllabus. There is evidence Yangtze accepted this offer as it delivered the goods to OVT and billed it in accordance with P.O. #7389. There was consideration—OVT was to pay Yangtze $54,095.40 for the goods. There was no dispute concerning contractual capacity, and one can infer that it and manifestation of mutual assent existed from the evidence. Moreover, there is no dispute concerning the legality of object and of consideration, i.e., the exchange of railroad materials for money. There

is also no dispute that Yangtze performed by providing the ordered goods to OVT, which accepted them.[10]

**{¶46}** Yangtze also presented evidence that OVT failed to fully perform under the contract and that Yangtze sustained damages. There was evidence that OVT paid Lucille A. Tierney, purportedly DBA as Yangtze Railroad Materials, for some of the materials instead of Yangtze and that Yangtze is still owed $40,000 under the contract.[11] We observe that Yangtze's contention that it is undisputed that it never received payment is not accurate. In its post-trial brief, OVT suggested the trial court should find Young was lying about Yangtze not owning or controlling the bank account at issue and that Yangtze received the payment. The trial court made no explicit finding regarding whether Yangtze received the payment, and Yangtze suggests that the court instead incorrectly focused on whether Yangtze proved that OVT did not submit payment. However, while the court's decision could have been clearer, it appears the court made the finding that Yangtze failed to prove OVT did not submit payment in response to Young's testimony indicating he believed OVT was lying about the disputed emails and wire transfer to avoid paying Yangtze. And it appears that the court believed the disputed emails were fraudulent and that Yangtze did not receive the money but concluded OVT's performance was legally

---

[10] We note that under R.C. 1302.04(A), a contract for the sale of goods of $500 or more is generally not enforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." There is no such writing here, but under R.C. 1302.04(C)(3), a contract which does not satisfy the requirements of R.C. 1302.04(A) but which is valid in other respects is enforceable "with respect to goods for which payment has been made and accepted or which have been received and accepted in accordance with section 1302.64 of the Revised Code."

[11] Although the check Miller purportedly sent, which Young testified Yangtze did not receive, was for $44,806.70, Yangtze did not present evidence to support a breach of contract claim regarding the other $4,806.70 or request damages for that additional amount in its post-trial brief.

excused because Yangtze was in the best position to discover the fraudulent prompt for payment and was therefore accountable for the loss.

{¶47} The implicit conclusion that Yangtze was in the best position to discover the fraudulent prompt for payment was against the manifest weight of the evidence. It appears the court reached this conclusion because it determined the fraud was perpetrated through Young's email account, and Yangtze was lax in its email security because multiple people had access to Young's email account. It also appears the court reached this conclusion because it determined that despite the presence of some discrepancies in the emails, OVT had no reason to question their authenticity because they came from Young's email address, Yangtze rejected payment by check and requested electronic payment, and according to the court, Yangtze told OVT it would send a "link for payment," and the link "came from the Plaintiff's email address shortly after Plaintiff agreed to send it."

{¶48} There is some evidence that the fraud was perpetrated through Young's email account—the paper copies of the emails show that all of messages purporting to be from Young came from his email account. Although Yangtze presented evidence about the use of visually similar characters to deceive people, there is no evidence that occurred here. However, there is also no evidence as to who the fraudster was or how they accessed Young's account and no evidence that the fact that Young allowed multiple people to access his account contributed to the fraud.

{¶49} But even if lax security regarding Young's email account created the scenario for loss, OVT was still in the best position to discover the fraudulent prompt for payment by taking reasonable precautions to verify the bank account information before

transferring the money. It may have been reasonable for OVT to not detect certain discrepancies in the emails. But there were obvious red flags OVT and the trial court overlooked.

{¶50} During the week of December 19, 2021, after Miller told Young she mailed a check, he asked her to cancel it and pay by ACH or wire transfer, and Miller responded:

> I am in the process of getting my password reset as I do not utilize the ACH system. It has been a few years since I have been in the online portal for the accounting part. As soon as I have received my reset information and am able to get it processed I will let you know.

The trial court found that Miller was informing Young "that she was making arrangements to use the ACH system." Young responded, "I we wait to hear from you soon thanks [sic][.]" Although additional emails were exchanged that week about bank account information, Miller never stated that OVT would pay by wire transfer instead of ACH. But the following week, when the bank account information was resent, the disputed email containing it stated, "Please as you have stated in your previous message last week to proceed with the wire transfer to our below wire instruction details today [sic]." And contrary to what the trial court found, the disputed emails did not include a "link for payment"; they included suspicious bank account information. The bank location was New Mexico, and Yangtze is in Maryland, a fact which Miller and Little knew. And more importantly, the account beneficiary was identified as Lucille A. Tierney DBA Yangtze Railroad Materials. Miller acknowledged that in the 17 to 18 years she had done business with Yangtze, she never dealt with someone named Lucille A. Tierney. OVT should have, at a minimum, called Yangtze to verify the authenticity of the account information before wiring the money to an account benefitting an unknown individual. If OVT had done so, it would have discovered the prompt for payment was fraudulent and avoided the loss.

**{¶51}** After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we find that in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment on the breach of contract claim must be reversed. Accordingly, we conclude the trial court's judgment on the breach of contract claim was against the manifest weight of the evidence, sustain the sole assignment of error, reverse the trial court's judgment as to the breach of contract claim, and remand for further proceedings consistent with this decision. Because Yangtze does not challenge the judgment as to the unjust enrichment claim, we affirm that part of the judgment.

JUDGMENT AFFIRMED IN PART
AND REVERSED IN PART.
CAUSE REMANDED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART and that the CAUSE IS REMANDED. Appellee shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Gallia County Common Pleas Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgement and Opinion.


For the Court


BY: _____
          Michael D. Hess, Judge




## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**